469 A.2d 867

**Walter G. FINCH et al.**

v.

**HUGHES AIRCRAFT COMPANY.**

**No. 393, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Jan. 11, 1984.

Certiorari Denied Jan. 12 and June 7, 1984.

192

Edward F. Sullivan, III, Charlottesville, Va., with whom was Walter G. Finch, Baltimore, on brief, for appellants.

Alan N. Halkett, Los Angeles, Cal., with whom were Peter L. Winik, Washington, D.C., Latham & Watkins, Los Angeles, Cal., Wilbur D. Preston, Jr., James R. Chason and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, on brief, for appellee.

Argued before MOYLAN, LOWE and GARRITY, JJ.

LOWE, Judge.

This appeal is the result of two cases and counterclaims which had been consolidated from the old Circuit Court and the Superior Court of Baltimore City. To understand better the unnecessarily complicated scenario we should point out that most of the controversy arose as a result of the fertile inventive mind of the now deceased Doctor William B. McLean, whose interests here are being represented by a trust which we will collectively refer to as "McLean". Walter Finch, the other appellant, is an attorney who, as some compensation for representing McLean, obtained an one-half interest in the patent which is at the heart of the controversy.

Dr. McLean had patented a space satellite—oriented invention to which the United States had a nonexclusive royalty-free license by reason of McLean's employment. Both he and Finch thought that such relationship had relinquished to the government complete use and control of the patent in the United States. When Hughes Aircraft Company became interested in the patent in 1967, it informed McLean and Finch of their retained rights, and negotiated a

license agreement for the patent for $10,000; however, McLean and Finch would not only be entitled to certain royalties therefrom but Hughes was to obtain a costly reissuance of the patent and pay the costs of any infringement actions.

The corporate assets of Hughes apparently were needed to explore the potential of the invention, but as Poor Richard commented in his Almanac, "[n]ecessity never made a good bargain." Three years later, having received minimal returns from this license, Finch approached Hughes to discuss a sale of the reissue rights of the patent and negotiated a price of $25,000 over Hughes' $100,000 offer by amending the License Agreement in August of 1970.

Dr. McLean died six years later, after which Mr. Finch and the McLean trustees contemplated the bargain which had been consummated of necessity in 1967, giving birth to the sale in 1970, and decided that "they" had been fraudulently seduced.

As a result they sued Hughes in equity seeking a rescission of the two contracts on the ground of fraudulent inducement and at law for damages on the same ground plus an allegation of breach of those "fraudulently induced" contracts. Finch, however, had also represented Hughes during part of that time in the reissuance of the patent and in patenting the invention in West Germany. He admittedly had overcharged Hughes for those services. This overcharge was the subject of the counterclaim, a judgment to which Finch consented except for the punitive damages added by the court.

The cases were consolidated and specially assigned to Judge Joseph H.H. Kaplan who found for Hughes on all counts including compensatory and punitive damages against Finch. The appeal therefrom raises a multitude of issues, but none of which the judge had failed to address in a meticulously crafted "Memorandum Opinion". In reviewing those issues we have carefully considered the arguments and patiently perused the 20 volumes of record extracts. We

concur in every aspect of Judge Kaplan's opinion. While we may have shortened it and even rephrased it to avoid too obvious an appearance of judicial plagiarism, we could not have improved it by denying Judge Kaplan the credit he deserves for such careful deliberation and such an articulate explanation of his conclusions. We will therefore adopt them as our own, and having edited his opinion only in minimal detail append it herewith. For the reasons he explains we will affirm his judgment.

JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.

## APPENDIX

### MEMORANDUM OPINION

Plaintiffs filed a Bill of Complaint in the Circuit Court of Baltimore City on April 27, 1978, against Hughes Aircraft Company seeking rescission of a License Agreement dated March 1, 1967 and an Amendment to that Agreement dated August 1, 1967[1] and an accounting. Plaintiffs allege that Defendant procured these contracts by making fraudulent misrepresentations and by purposefully concealing material facts with the intent to deceive and mislead Plaintiffs and to induce them to enter into these contracts.

In its Answer, Defendant denies Plaintiffs' allegations of fraud and raises the defenses of limitations and laches. Defendant also avers that one of the plaintiffs, Walter G. Finch, Esquire, is not entitled to relief in a court of equity because he comes to the court with unclean hands. Defendant alleges that Mr. Finch, an attorney, represented Defendant in the application for the reissue patent which is the subject of the License Agreement and Amendment and in efforts to obtain patent coverage in certain foreign countries. Defendant alleges that during the course of this representation, Mr. Finch submitted bills to Defendant for professional services rendered by Mr. Finch which were falsely inflated, in that they overstated the amount of time

1. 1970.

APPENDIX—Continued

spent by Mr. Finch in rendering services to Defendant. Defendant alleges that these bills were fraudulently prepared at the direction of Mr. Finch with the intent to deceive and mislead Defendant.

Allegations of fraud in connection with Mr. Finch's billing to Defendant for professional services are also the basis for Defendant's Counterclaim against Mr. Finch filed on May 31, 1978. Mr. Finch filed a Motion to Dismiss the Counterclaim, which he later withdrew. At trial, on January 28, 1982, Mr. Finch, by his attorney, consented on the record to the entry of judgment against him on this Counterclaim in the amount of $23,077.27. T. 2138.

Plaintiffs filed a Declaration in the Superior Court of Baltimore City on January 14, 1980, against Hughes Aircraft Company. In their first count, Plaintiffs claim one billion dollars in compensatory and punitive damages for Defendant's alleged fraud in connection with the procurement of the License Agreement and Amendment. In their second count, Plaintiffs claim two hundred million dollars for Defendant's alleged breach of the two contracts between the parties.

Defendant filed general issue pleas, a special plea of limitations and a Counterclaim containing the same allegations as the Counterclaim filed in the Circuit Court case. In its Counterclaim, Defendant claims compensatory damages of $50,000.00 and punitive damages of $200,000.00. Plaintiffs have responded to the Counterclaim by motion raising the defense of lack of legal capacity to sue on the part of the Counter-Plaintiff.

These cases were tried concurrently in January, 1982, and the parties submitted proposed findings of fact and conclusions of law in March, 1982. The Court heard argument of counsel on March 26, 1982.

## FINDINGS OF FACT

### I

Walter G. Finch, Esquire, one of the plaintiffs, has been engaged in the private practice of law in Baltimore City

APPENDIX—Continued

since 1957. Mr. Finch holds Bachelor's and Master's Degrees in engineering (Johns Hopkins University, 1940, 1950), Bachelor's and Master's Degrees in accounting (Temple University, 1949), a Juris Doctor Degree and Master's Degree in patent law (Temple University, 1948; George Washington University, 1949) and a Master's Degree in business administration (Temple University, 1949). He has been a certified public accountant since 1966.

Before he entered private practice, Mr. Finch gained extensive experience in the field of patent law and practice. He joined Westinghouse Electric Company's patent department in 1950 and was employed as a patent drafter. While at Westinghouse, his duties included the making of infringement studies, royalty studies, state of the art studies and preliminary investigations in the United States Patent Office. Near the end of 1951, he took a position with a Washington, D.C. law firm which specialized in patent law. During this period he prosecuted patent applications and conducted various studies in the Patent Office. After approximately one year, Mr. Finch left the Washington, D.C. firm and joined the patent staff of the Applied Physics Laboratory of the Johns Hopkins University. His duties there included the preparation and prosecution of patent applications.

In 1957, Mr. Finch received several contracts to prepare patent applications on missiles for the United States Navy. At about the same time, the son of a deceased Baltimore patent lawyer asked Mr. Finch to take over his father's practice. These events enabled Mr. Finch to enter private practice as a sole practitioner in the area of patent law.

Edith L. McLean, Mark A. McLean and California First Bank, the remaining plaintiffs, are trustees of the McLean 1976 Family Trust under a Deed of Trust from William B. McLean and Edith L. McLean dated March 9, 1976. Included among the assets of this trust at the time it was established was all of Dr. William B. McLean's right, title and

APPENDIX—Continued

interest in U.S. Patent 3,216,674, one of the patents involved in the instant litigation. Dr. McLean died in August, 1976.

Defendant, Hughes Aircraft Company, is a Delaware corporation with principal corporate offices located in Culver City, California. Hughes began its communication satellite program in the Fall of 1959. In 1970, approximately five percent of Hughes' total business was in the field of communications satellites. Today, communications satellites comprise about ten percent of Hughes' total business.

Dr. McLean was educated at California Institute of Technology and held three degrees in physics from that institution (B.S., 1935; M.S., 1937; Ph.D., 1939). Dr. McLean was employed as a civilian scientist with the United States Navy from 1945 until his retirement in 1974. After heading several departments and divisions of the U.S. Naval Ordnance Test Station, China Lake, California, Dr. McLean was appointed its Technical Director in 1954. In 1967, Dr. McLean left China Lake to become the Technical Director of the Naval Undersea Research and Development Center, San Diego, California. He remained there until he retired in 1974.

Dr. McLean received a number of awards, including the President's Award for Distinguished Federal Civilian Service, for his role in the invention and development of the Sidewinder Guided Missile Weapon System. He was a prolific inventor and held over thirty patents. Dr. McLean maintained a continuing interest in space technology and in the space program throughout his lifetime.

In 1956, Dr. McLean was interested in retaining patent counsel and Mr. Finch was recommended to him. Thereafter, Mr. Finch represented Dr. McLean in connection with a number of Dr. McLean's patents. At some time during the late 1950's or early 1960's, Mr. Finch and Dr. McLean arrived at a fee arrangement: each time that Mr. Finch processed a patent application for Dr. McLean, Dr. McLean would assign to Mr. Finch a one-half interest in the patent

APPENDIX—Continued

application and subject invention. The costs of prosecuting each application were divided equally between them.

In May, 1965, Dr. McLean assigned to Mr. Finch a one-half interest in the patent application for his invention "proportional navigation system for a spinning body in free space" which ripened into U.S. Patent 3,216,674. In return, Mr. Finch agreed to perform, without further charge, certain professional services for Dr. McLean in connection with the preparation and prosecution of patent applications for the subject invention and to exploit commercially the invention and any patent obtained on the invention. At the time he agreed to exploit commercially U.S. Patent 3,216,674, Mr. Finch understood that he would be negotiating with government agencies and large corporations. If at any time during the course of negotiations, he had felt incapable of or unqualified to conduct these negotiations, he would have sought outside assistance.

In 1967, at the time negotiations commenced between Mr. Finch and Hughes Aircraft Company concerning the grant of a license to Hughes under U.S. Patent 3,216,674, Mr. Finch was an experienced patent attorney and had negotiated license agreements on behalf of Dr. McLean and himself in the past. Hughes Aircraft Company personnel had no reason to believe that Mr. Finch was not completely capable of representing himself and Dr. McLean during negotiations with Hughes. Mr. Finch understood, before he commenced negotiations with Hughes, that he and Dr. McLean were going to be dealing in arm's length negotiations with Hughes.

Dr. McLean and Mr. Finch maintained a close working relationship with respect to all matters involving the patents which are the subject of this litigation and with respect to Mr. Finch's negotiations with Hughes Aircraft Company. Dr. McLean never indicated to his wife, Edith McLean, his son, Mark McLean, his secretary, Thelma Flowers, or his friend, Willis Forman, that he felt that he had been misled by, taken advantage of by, defrauded by or in any way dealt

APPENDIX—Continued

with unfairly by Hughes Aircraft Company or any of its officers or employees. The instant litigation was instituted by Mr. Finch after Dr. McLean's death.

## II

Research and development in the area of communications satellites by private industry and the United States accelerated after the Soviet Union launched Sputnik in October, 1957. At that time Dr. McLean, then Technical Director of the U.S. Naval Ordnance Test Station at China Lake, began to develop the invention which became the subject of U.S. Patent 3,216,674 (this invention is hereinafter referred to as the McLean invention). Dr. McLean's goal was the development of a device able to track, intercept and destroy satellites in orbit in the same way that an air rocket was able to intercept aircraft in flight.

In 1959, the U.S. Navy filed a patent application in Dr. McLean's name. On November 9, 1965, U.S. Patent 3,216,-674 (hereinafter also referred to as the McLean Patent) was issued to Dr. McLean and Mr. Finch. The United States was granted a royalty-free, non-exclusive license under the McLean Patent.

The nineteen claims of the McLean Patent were limited to the field of self-contained proportional navigation apparatus for following a collision course to a target body. In other words, the McLean Patent was limited to a target-seeking space vehicle incapable of being controlled from the ground. None of Hughes' satellites came within the scope of any of the claims of the McLean Patent.

In March, 1967, Dr. McLean and Mr. Finch granted to Hughes Aircraft Company a license under the McLean Patent. The License Agreement was amended in August, 1970. In May, 1970, after surrender of the original, the McLean Patent was reissued as Reissue Patent 26,887 (hereinafter also referred to as the McLean Reissue).

APPENDIX—Continued
III

The launching of Sputnik spurred Hughes Aircraft Company's research and development efforts in the area of communications satellites. Scientists at Hughes concentrated their efforts on the commercial development of a synchronous communications satellite. One of Hughes' scientists, Donald Williams, invented a method for positioning a satellite in a synchronous orbit and for controlling and altering the velocity and orientation of the satellite once it had achieved orbit. Mr. Williams was not aware of the McLean invention at the time he invented his system for attitude and velocity control.

In April, 1960, Mr. Williams filed an application for a patent on his invention (hereinafter referred to as the Williams invention), which was replaced in August, 1964, by a continuation-in-part application (hereinafter collectively referred to as the Williams application).

In 1965, claims 8, 9, 11, 12 and 14 in the Williams patent application were allowed. By Office Action dated January 10, 1966, the allowance of claims 8, 9, 11, 12 and 14 was withdrawn. Among the reasons given for disallowance was that certain of the claims were unpatentable because the combination of disclosures in the McLean Patent and another patent, not otherwise relevant to the issues herein, would render certain features of the Williams invention obvious to one of ordinary skill in the art.

The Williams system for satellite control involved the phenomenon of precession and its use in control of the attitude and velocity of a spinning satellite. Attitude and velocity control was to be achieved through the discharge of gas from pulsed jets located on the periphery of the satellite. The timing and duration of these pulses were to be controlled by radio signals sent from an earth station to the satellite.

Although Mr. Williams "independently conceived the idea of precessing the spin axis of a spinning body into a desired orientation by pulsing a gas jet mounted on the body's

APPENDIX—Continued

periphery, he was not the first inventor of that concept." Plaintiffs' Exhibit 441 at 39. The McLean Patent disclosed that Dr. McLean was the first to conceive this technique.

Noel Hammond was a patent agent employed in Hughes' patent department. Mr. Hammond was one of the persons engaged in prosecuting the Williams application. After receipt of the Office Action dated January 10, 1966, disallowing all claims, Mr. Hammond received and reviewed a copy of the McLean patent. Mr. Hammond then prepared an amendment to the Williams application and filed the amendment with the Patent Office on April 29, 1966. The proposed amendment to the Williams application replaced the disallowed claims with three newly drafted claims; the coverage of the new claims was limited to a method for external control of the attitude and velocity control system, as from an earth station. By Office Action dated May 4, 1966, the Patent Office notified Hughes that all remaining claims were allowable and that prosecution of the application was closed.

The National Aeronautics and Space Administration (NASA) asserted title to the Williams patent on December 27, 1966. The matter was referred to a Board of Patent Interferences; the Board awarded title to NASA. The Court of Customs and Patent Appeals reversed the Board and awarded title to Hughes. The Williams patent was issued to Hughes on September 11, 1973.

Neither Hughes nor any of its representatives perpetrated any fraud on the Patent Office during the prosecution of any of the patent applications involved in the instant litigation and their conduct was in no way improper.

IV

William E. Schuyler was a patent lawyer retained by Hughes in connection with a title dispute with NASA over a patent which covered an invention by Mr. Williams and Dr. Harold A. Rosen, a scientist employed by Hughes. In mid-1966, while Mr. Schuyler was at Hughes' offices on business

APPENDIX—Continued

unrelated to the Williams patent, its status was discussed with him. Mr. Schuyler suggested that Hughes obtain rights in the McLean Patent and see if it could be reissued with broader claims. He was the first to suggest this. The reason given by Mr. Schuyler for his suggestion was that the McLean Patent appeared to contain a disclosure that could dominate the field of precession in space.

Mr. Schuyler thought that it would be in Hughes' best interest to obtain rights in the McLean Patent and to reissue it, if possible, because if properly reissued, the patent could have claims which would dominate in the field of satellites and other space vehicles with respect to velocity and attitude control. Therefore, a properly reissued McLean Patent could dominate the Williams system for attitude and velocity control of a spinning satellite except for those features dealing with control of the on-board apparatus from an external control station. These latter features ultimately became the subject of the claims of the Williams patent when it issued in 1973. During this period of time, the Williams system for attitude and velocity control was being used in satellites manufactured by Hughes.

Hughes decided that it would be prudent to attempt to acquire rights in the McLean Patent and to have it reissued. Additional information about the McLean Patent was needed. Mr. Hammond ordered the McLean file wrapper from the U.S. Patent Office and ordered a title report made in order to determine the ownership of rights under the patent. Hughes learned that Mr. Finch and Dr. McLean each owned a one-half interest in the McLean Patent and that the United States held a royalty-free non-exclusive license. In order that the value of potential reissue claims might be assessed, Mr. Hammond was directed to prepare some draft claims.

## V

In 1966, Dr. Allen E. Puckett was a senior executive at Hughes Aircraft Company. Dr. Puckett was acquainted

APPENDIX—Continued

with Dr. McLean; their relationship was based on professional rather than social contacts. They first met in the mid-1950's at a professional society meeting or similar gathering. Both men served on an advisory committee to the Department of Defense's United States Mutual Weapons Development Program. Dr. Puckett became a member in the mid-1950's. The committee had about fifteen members and met irregularly over about a five year period. Dr. McLean and Dr. Puckett were present together at about four or five of these meetings over the five year period. Dr. McLean and Dr. Puckett both traveled with the committee on at least one trip to Europe of one to two weeks duration. Outside of these committee meetings, Dr. Puckett and Dr. McLean did not see each other except occasionally at professional society meetings. Sometime during the late 1950's, Dr. Puckett was at China Lake on business and saw Dr. McLean. A group of about fifteen people, including Dr. Puckett, lunched at Dr. McLean's house. Other than a chance encounter at a professional meeting, perhaps once or twice a year, there was no other contact between Dr. McLean and Dr. Puckett until 1966 when Dr. Puckett contacted him concerning Hughes' desire to acquire rights in the McLean Patent.

Dr. McLean and Dr. Puckett each held the other in high regard and their relationship was friendly. Since Dr. Puckett knew Dr. McLean, he agreed to contact Dr. McLean and open the door to negotiations for the acquisition by Hughes of rights in the McLean Patent. In October, 1966, Dr. Puckett telephoned Dr. McLean in order to ascertain whether Dr. McLean was interested in pursuing the matter of Hughes acquiring rights in the McLean Patent. If Dr. McLean were interested, Dr. Puckett intended to try to arrange a meeting between Hughes' patent people and Dr. McLean or whomever he might designate. Dr. Puckett does not recall the details of that conversation. The only contemporaneous account of that conversation is that contained in a letter written by Dr. McLean to Mr. Finch shortly after the October, 1966, telephone conversation between Dr. Puckett

APPENDIX—Continued

and Dr. McLean. Plaintiffs' Exhibit 26. That letter does not purport to recount the actual words used by Dr. Puckett.

Dr. Puckett has testified that Dr. McLean's account of the call was more or less accurate, but Dr. Puckett does not believe that he used the words "studying all patents". Since Dr. Puckett cannot recall what was said, and Dr. McLean's letter did not purport to reproduce the exact words used by Dr. Puckett, the Court has before it no evidence from which it can make any findings as to exactly what Dr. Puckett said to Dr. McLean. The Court will not rely on Dr. McLean's letter because the Court has no way of determining whether or not the letter accurately reflects the conversation between Dr. Puckett and Dr. McLean nor whether it was intended to do so. Dr. McLean testified during a deposition in 1975 that his "memory of the conversation with Puckett was that he simply stated that Hughes was interested in the patent which I had at that time, and suggested that we set up a meeting to discuss it." Defendant's Exhibit 738 (marked Defendant's Exhibit 693) at 126. The Court finds that the substance of what Dr. Puckett said was that Hughes was interested in patents in the field of communications satellites, that Dr. McLean owned a patent which might relate to the control mechanism of a satellite and that Hughes was interested in negotiating for rights under the patent. Whatever the exact words used by Dr. Puckett may have been, he was simply trying to convey to Dr. McLean the fact that Dr. McLean had a patent that was of interest to Hughes and that Dr. Puckett thought it would be worthwhile for Hughes' people to talk to whomever Dr. McLean might designate.

Dr. Puckett did not intentionally withhold information from Dr. McLean during this telephone conversation in order to deceive Mr. Finch and Dr. McLean or to induce them to enter into a contract. Dr. Puckett made no statements during this conversation with the intent to deceive Mr. Finch and Dr. McLean or to induce them to enter into a contract. Dr. Puckett's telephone call to Dr. McLean was not part of any plan of Hughes Aircraft Company to de-

APPENDIX—Continued

fraud or take advantage of Mr. Finch and Dr. McLean. There was never, at any time, any plan at Hughes, or involving Hughes' officers, employees, agents or representatives, designed to defraud, mislead, deceive, cheat or otherwise take advantage of, or treat unfairly, Mr. Finch or Dr. McLean. Hughes intended to, and did, deal with Mr. Finch and Dr. McLean fairly and at arm's length.

After his telephone conversation with Dr. Puckett, Dr. McLean wrote to Mr. Finch in an undated letter advising him of Dr. Puckett's call and of Hughes' interest in their patent relating to the control mechanism for a satellite. He suggested that Mr. Finch inform Dr. Puckett of the status of their rights in the patent. After a review of his records, Mr. Finch erroneously concluded that all rights in the McLean Patent had been assigned to the United States. In a letter dated October 6,[2] 1966, he informed Dr. McLean that it was his understanding that all rights in the U.S. patent had been assigned to the government. Dr. McLean forwarded Mr. Finch's letter to Dr. Puckett on November 2, 1966, with a cover letter stating that it appeared that all rights in the U.S. patent had been assigned to the government.

After he received the two letters, Dr. Puckett passed the information to Hughes' patent department to pursue in whatever way they thought advisable. Upon receiving copies of the two letters, James K. Haskell, Director of Hughes' Patent and Licensing Department, asked counsel in Washington, D.C., to examine the Patent Office files and determine the extent of the government's rights. Counsel reported to Mr. Haskell that the Patent Office files showed that the government had only a non-exclusive, royalty-free license.

A meeting, the subject of which was space patents, was held at Hughes Aircraft Company on February 6, 1967. Among the eight topics on the agenda was "Plans for purchase of McLean Patent." Plaintiffs' Exhibit 9. With

---

2. October 26.

APPENDIX—Continued

respect to the McLean Patent, the consensus of the meeting was that Hughes should acquire rights in the McLean Patent and file an application for a reissue patent.

Either at this meeting or shortly thereafter, Hughes decided to seek a license under the McLean Patent rather than a purchase of the patent. As licensors, Mr. Finch and Dr. McLean would have incentive to cooperate in infringement actions and in the reissue process because they would retain a financial interest in the patent. Additionally, Hughes was not certain of the value of the McLean Patent.

## VI

On February 7, 1967, Dr. Puckett telephoned Dr. McLean about the McLean Patent. Dr. McLean suggested that Dr. Puckett contact Mr. Finch. After talking to Dr. McLean, Dr. Puckett wrote a letter to Mr. Finch dated February 7, 1967; he informed Mr. Finch that Hughes' staff had received the impression from a review of Patent Office files that Mr. Finch and Dr. McLean still retained some rights in the McLean Patent. In an attempt to be diplomatic, Dr. Puckett stated that he recognized that agreements not of record might exist and suggested that a meeting between members of Hughes' patent staff and Mr. Finch might aid in establishing the status of rights in the McLean Patent. Dr. Puckett stated that several members of Hughes' patent department would be in Washington the following week and would be calling to arrange an appointment with Mr. Finch.

The letter of February 7, 1967, was not intended by Dr. Puckett to mislead or deceive Mr. Finch and Dr. McLean or to induce them to enter into a contract. The letter was not part of any plan or scheme to take advantage of Mr. Finch and Dr. McLean.

In a telephone conversation on February 9, 1967, and by letter dated February 10, 1967, Mr. Finch advised Dr. Puckett that Mr. Finch and Dr. McLean would be willing to grant to Hughes an exclusive, world-wide license under both U.S. and foreign patents if reasonable terms could be negoti-

APPENDIX—Continued

ated. He also stated that "[i]t is believed that this invention may be of interest to German manufacturers", Plaintiffs' Exhibit 33, although no German or other manufacturers had expressed any interest in the McLean Patent or invention. In fact, Mr. Finch's reference to German manufacturers was salesmanship. Mr. Finch was aware that he would be dealing with the Hughes representatives in an arm's length negotiation. Mr. Finch did not expect Dr. Puckett to "make the deal" for Mr. Finch and Dr. McLean. Mr. Finch understood that he would be negotiating for himself and Dr. McLean and that the Hughes representatives would be negotiating on behalf of Hughes. Mr. Finch understood that Hughes would not give up any more than that which he might negotiate from them.

Hughes Aircraft Company was also prepared to enter into arm's length negotiations. A memorandum dated February 10, 1967, set forth Hughes' object in negotiating for rights in the McLean Patent and the rights Hughes wanted to acquire. Also set forth were the terms of an offer of payment for these rights and ways in which the offer could be modified during negotiations. Hughes had had no business dealings or other contact with either Mr. Finch or Dr. McLean before Dr. Puckett telephoned Dr. McLean on February 7, 1967. Neither Mr. Finch nor Dr. McLean gave any Hughes officer, employee, agent or representative any reason to believe that Mr. Finch and Dr. McLean were relying on Hughes or any of its officers, employees, agents or representatives to protect the interests of Mr. Finch and Dr. McLean during the negotiation of the License Agreement. Neither Mr. Finch nor Dr. McLean was relying on Hughes or any of its officers, employees, agents or representatives to protect their interests during the negotiation of the License Agreement.

On February 14, 1967, Mr. Haskell, Paul S. Visher, Associate Manager of Hughes' Space Systems Division, and Mr. Finch met in Mr. Finch's office in Baltimore City. During the meeting, Hughes' representatives told Mr. Finch that Hughes was seeking patent protection in the area of commu-

APPENDIX—Continued

nications satellites, a field in which Hughes was extensively involved. Mr. Finch was informed that the claims of the original patent had limited value to Hughes as they related to a target-seeking system. Mr. Finch was informed that Hughes was interested in obtaining a license under the McLean Patent provided that Mr. Finch and Dr. McLean would agree to reissue the patent. He was told that the patent had potential value to Hughes if reissued with broader claims. He was told that Hughes believed that "this would be a terrific field in the future" and that this was why Hughes wanted to reissue the patent. Defendant's Exhibit 705 at 286; T. 1050.

The subject of the patent's reissue was explored in some detail. The potential value of the teachings of the McLean Patent and the need for reissue were discussed. Mechanisms for attitude and velocity control then in use by Hughes were discussed in a general fashion. The general area of the difference between a target-seeker, which is what the patent claimed, and claims for attitude and velocity control of a satellite was discussed. Mr. Finch was told that Hughes' satellites used a pulse jet system and were ground controlled.

Hughes representatives spent some time trying to get Mr. Finch to distinguish between a guidance system with a seeker system and a pulse jet control system for a satellite. Mr. Visher recalled,

"We would try to describe the pulse jet system as limited to an attitude control, and he would tend to go back to the seeker system and go back to try to license his products in Europe.

"It was a difficult meeting to try to get him to focus on what the reissue had to be or should be . . . ."

Plaintiffs' Exhibit 272 at 35. Hughes' representatives had difficulty getting Mr. Finch to discuss Hughes interest in the McLean Patent. Mr. Visher recalled,

". . . I was surprised at the degree that Mr. Finch was trying to sell us other patent applications and licenses

APPENDIX—Continued

which he said had asset values in European missiles or potential European missiles. It was a meeting in which I was surprised at our inability of getting down to issues of this license versus talking about all the other things which Mr. Finch might have that might be of interest to Hughes Aircraft Company."

*Id.* at 29–30.

During the discussion of the differences between a seeker system as claimed by the McLean Patent and the pulse jet system needed for a satellite, Hughes' representatives described how SYNCOM (a Hughes satellite which embodied the Williams system for attitude and velocity control) worked. SYNCOM was described as a "satellite which had both an attitude and a velocity control system working on a pulse jet with reference to its spin cycle." *Id.* at 38–39. Although Mr. Finch asked for details as to the way in which the claims of the McLean Patent failed to claim all that could be claimed given the disclosures in the patent, Hughes' representatives refused to provide specific information. Mr. Finch later informed Dr. McLean of this fact; despite Hughes' refusal to provide this information, Mr. Finch and Dr. McLean elected to proceed with negotiations with Hughes.

At the meeting on February 14, 1967, there was also some discussion about Hughes' interest in acquiring the right to sublicense others. Mr. Finch was informed that Hughes had other patents and patent applications in the satellite field. Under the proposed license agreement, Mr. Finch and Dr. McLean would receive five percent of all royalties received through licensing arrangements with third parties involving these patents if the McLean Patent or a McLean reissue patent was one of the licensed patents. Mr. Finch and Dr. McLean understood, at that time, that they would receive royalties paid as a result of the license arrangements with third parties *only* when the McLean Patent was included in the license arrangement. Mr. Finch expressly recognized this fact in a letter to Dr. McLean dated February 14, 1967, and in a letter to Mr. Haskell dated February 7, 1974.

APPENDIX—Continued

Hughes' later payment to Mr. Finch and Dr. McLean of a percentage of royalties received as the result of a license arrangement with Nippon Electric Company, Ltd. (NEC) was not inconsistent with this interpretation of the contract, as alleged by Plaintiffs, because Hughes granted to NEC rights under all of Hughes' patents; therefore, the McLean Patent was included in the license.

Hughes' representatives at the meeting on February 14, 1967, did not represent to Mr. Finch that Hughes' main interest in the McLean Patent was in sublicensing others and not for its own use, that Hughes had not used or was not using the McLean invention as disclosed in the McLean Patent or that Hughes' satellites did not fall within the scope of potential reissue claims.

Hughes' representatives told Mr. Finch that the McLean Patent had limited value to Hughes as it then existed. It was true that the patent was of limited value to Hughes unless reissued. Its value as "insurance" was minimal. The deadline for filing a reissue application in the Patent Office was in November, 1967. By February, 1967, no one had evidenced the slightest interest in doing so. The Court finds that had it not been for Hughes' initiative, Mr. Finch and Dr. McLean would not have filed a reissue application and that before the suggestion by Hughes that this should be done, Mr. Finch and Dr. McLean had not considered doing so. Indeed, Mr. Finch and Dr. McLean were not even aware that they retained rights in the patent until Dr. Puckett so informed Mr. Finch in February, 1967. Furthermore, Hughes was not manufacturing and had no plans to manufacture equipment falling within the scope of the nineteen claims of the McLean Patent.

Hughes' representatives at the meeting on February 14, 1967, did not make any statements with the intent to deceive or mislead Mr. Finch and Dr. McLean or to induce them to enter into a contract. Messrs. Haskell and Visher did not suppress or conceal any information from Mr. Finch with the intent to deceive or mislead Mr. Finch and Dr. McLean or to

APPENDIX—Continued

induce them to enter into a contract. Messrs. Haskell and Visher had received no instructions to suppress or conceal information.

During this meeting, Mr. Finch suggested that Hughes engage his services as patent counsel in connection with the reissue application. Mr. Finch recalled,

"I told them, since they are going to use McLean's services and reissue this, that they consider using my services because I was perhaps the most familiar with this patent application to advise them on the thing, on the preparation and filing of the reissue application. They had to have the information from someone, and who was in a better position to give it to them than myself. After all, lawyers are always looking for business."

Defendant's Exhibit 705 at 281. Hughes agreed to retain Mr. Finch's services in connection with the reissue application; he began to render services to Hughes in mid-April, 1967. Hughes retained Mr. Finch's services on the advice of its patent department. They believed that since Mr. Finch had been associated with the original patent that his services might be helpful. Mr. Finch's location near Washington, D.C., was also a factor. Finally, Hughes' patent people believed that this would be "a way of keeping his interest in the activity." Plaintiffs' Exhibit 260 at 134. Since Mr. Finch and Dr. McLean had to be parties to any reissue application and their cooperation was necessary, the Hughes people believed that it would be a good idea if Mr. Finch and Dr. McLean were actively associated with the prosecution of the reissue application. Hughes' retention of Mr. Finch's services was not part of any plan or scheme to defraud, deceive or to otherwise take advantage of Dr. McLean and Mr. Finch.

During the meeting on February 14, 1967, Messrs. Visher and Haskell gave Mr. Finch a copy of a proposed license agreement. Mr. Finch read the agreement and then discussed its terms with Hughes' representatives. Neither of Hughes' representatives made any statements or promises which were inconsistent with the terms of the proposed

APPENDIX—Continued

license agreement. After reading the proposed agreement, Mr. Finch told Messrs. Visher and Haskell that he desired certain changes in its terms: first, a change in the provision for a $5,000.00 advance against future royalties—Mr. Finch proposed a $10,000.00 lump sum payment which would not be an advance—and secondly, a right in Mr. Finch and Dr. McLean to terminate the agreement in the event Hughes paid less than a certain amount in royalties in any year.

Negotiations continued after the meeting. On February 23, 1967, Mr. Finch and Dr. Puckett had a telephone conversation during which they discussed the proposals made by Mr. Finch at the meeting on February 14. These proposals were accepted by Hughes and incorporated into a second proposed license agreement. Mr. Finch did not sign the second proposed license agreement but sent it to Dr. McLean with a letter dated March 6, 1967, suggesting that Dr. McLean call Dr. Puckett and inquire whether Hughes would pay Mr. Finch and Dr. McLean royalties if Hughes used the McLean invention for its own purposes. Mr. Finch made this suggestion because he realized that Hughes' satellites might come within the scope of the claims of a reissued McLean Patent. Hughes agreed to pay royalties to Mr. Finch and Dr. McLean if it used the invention claimed in the McLean Patent and any reissue of the patent. On March 28, 1967, Mr. Haskell wrote a letter to Mr. Finch enclosing a revised license agreement signed by Dr. Puckett and a check for $10,000.00.

On April 3, 1967, Mr. Finch met with Dr. McLean in Washington, D.C. They reviewed and discussed the License Agreement and concluded that it was reasonable. Dr. McLean signed it at that time; Mr. Finch signed it upon his return to Baltimore.

Plaintiffs have presented no expert testimony or evidence that the royalty provisions of the License Agreement were unreasonable, and the Court cannot conclude that they were

APPENDIX—Continued

unfair to Mr. Finch and Dr. McLean.* Apparently, with the benefit of hindsight, Mr. Finch believes that he made a bad deal. However, at the time the License Agreement was executed, both Mr. Finch, an experienced patent attorney, and Dr. McLean believed that they had negotiated a reasonable royalty. Hughes personnel had no reason to believe that the royalty provisions were unfair to Dr. McLean and Mr. Finch: Hughes had agreed to pay all costs and expenses of any reissue and any infringement suits, it had agreed to pay a non-refundable sum of $10,000.00 to Mr. Finch and Dr. McLean (this was not an advance and could not be recovered by Hughes even if no royalties were received from third parties), Hughes did not know whether it would be able to obtain a reissue of the patent and the scope of any allowed reissue claims was uncertain. Hughes was uncertain as to the value of the McLean Patent at that time.

The License Agreement was fairly negotiated at arm's length. Nothing in the License Agreement was false or misleading. Hughes did not draft any part of the License Agreement with the intention to deceive or mislead Mr.

---

* Plaintiffs have argued that a royalty provision in a contract between COMSAT and Hughes (the Intelsat II Contract) should be used as a standard of reasonableness. However, the Intelsat II Contract provided for royalties for use of the control systems described in the Williams application and another patent application not otherwise relevant to the instant litigation. These patent applications contained claims that were different from those contained in the McLean Patent and the reissue of the McLean Patent. This fact alone serves to render the provisions of the Intelsat II Contract inconclusive on the issue of the reasonableness of the License Agreement. Moreover, the Intelsat II Contract provided for royalty payments from COMSAT to Hughes if Hughes obtained patent protection on the control systems of satellites sold to COMSAT; the effect of this provision was to increase the purchase price of the satellites covered by the contract if Hughes obtained patent protection. The effect of the License Agreement between Hughes and Mr. Finch and Dr. McLean was to increase the cost to Hughes of manufacturing a satellite by requiring it to pay to Mr. Finch and Dr. McLean a royalty for use of the McLean invention. For this reason, also, the Court finds the Intelsat II Contract unpersuasive on the issue of the reasonableness of the License Agreement.

APPENDIX—Continued

Finch and Dr. McLean or to induce them to enter into a contract.

## VII

In early April, 1967, Mr. Haskell sent a draft of proposed reissue claims to Mr. Finch. Upon receiving these claims, Mr. Finch reviewed them and had them reviewed by a patent engineer for technical accuracy. Near the end of the month, Mr. Finch met with Dr. McLean in Washington, D.C., and the two reviewed the proposed reissue claims in preparation for a meeting to be held in May at Hughes' offices in Los Angeles, California.

On May 1, 1967, Mr. Finch and Dr. McLean attended a meeting at Hughes' offices in Los Angeles. A number of Hughes' top executives were present. The purpose of the meeting was to review the proposed reissue claims, to revise them and draft additional claims, if necessary, and to make sure that Hughes had the information necessary to prepare a reissue application.

During the meeting, the proposed claims were discussed, one at a time. Both Mr. Finch and Dr. McLean participated in the discussion and each suggested changes in the proposed claims. Mr. Finch and Dr. McLean also provided Hughes with information to be used in the declaration to be filed with the reissue application and in the application. The entire approach that would be taken regarding the reissue application was discussed.

During the meeting on May 1, 1967, Hughes' representatives did not make any statements with the intent to deceive or mislead Mr. Finch and Dr. McLean. Hughes' representatives did not make any statements designed to convey the impression that the McLean invention or McLean Patent and reissue would have little future value to Hughes, that it[s] future value was doubtful or that it was not important to Hughes. On the contrary, the presence of top executives of the company indicated that the patent was of interest and importance to Hughes.

APPENDIX—Continued

At the meeting, Mr. Finch and Dr. McLean were informed of the existence of the then pending Williams application.

After the meeting, Hughes drafted the reissue application and supporting papers. These materials were sent to Mr. Finch on May 3, 1967. After reviewing these papers, Mr. Finch and Dr. McLean executed them and Mr. Finch filed them in the Patent Office on May 15, 1967.

These documents contained information given to Hughes by Mr. Finch and Dr. McLean. Mr. Finch has stated that he would not have filed the documents in the Patent Office unless he had been satisfied that all of the statements contained in these documents were true.

Mr. Finch and Dr. McLean were actively involved in the prosecution of the reissue application during the entire time it was pending in the Patent Office. Mr. Finch has stated that "there was never any time any pressure put on me by Hughes" and that Mr. Finch "had complete control of the patent prosecution in the United States Patent Office." Defendant's Exhibit 749 (deposition marked Defendant's Exhibit 714) at 174–75; T. 1243–44. Mr. Finch and Hughes' patent staff collaborated throughout the prosecution of the reissue application. Mr. Finch either drafted or approved every written submission to the Patent Office.

Hughes did not conceal any information relevant to the prosecution of the reissue application from Mr. Finch and Dr. McLean. Hughes did not conceal any information relevant to the prosecution of the reissue application from the Patent Office. Hughes did nothing improper or unethical in connection with the prosecution of the reissue application.

On February 14, 1970, the Patent Office issued a Notice of Allowance and on May 19, 1970, the McLean Patent was reissued.

On February 27, 1970, Mr. Finch wrote to Hughes, "In view of the fact that the patent is now going to issue with broad claims, is there any possibility that Hughes would be interested in acquiring all the rights to the

APPENDIX—Continued

patent. If so, I would appreciate having an offer from Hughes for a reasonable and fair price."

Mr. Haskell called Mr. Finch in late July, 1970, and offered $100,000.00 for a paid-up license to Hughes. Mr. Finch and Dr. McLean counter-offered to grant Hughes a paid-up license for $125,000.00. Mr. Haskell contacted Mr. Finch and agreed on Hughes' behalf to purchase a paid-up license for $125,000.00.

Mr. Finch and Dr. McLean signed the amendment to the License Agreement on August 4, 1970.

## VIII

Hughes' activities in the field of communications satellites have always been well-publicized. During the period between the execution of the License Agreement in April, 1967, and the execution of the amendment in August, 1970, Hughes' activity in the satellite field continued amid widespread publicity. During this time the final satellite of the Intelsat II program and four ATS satellites were launched.

On October 18, 1968, Hughes entered into an agreement with COMSAT (the Intelsat IV Contract) by which Hughes agreed to manufacture four satellites for the Intelsat IV communications satellite program. The contract provided that COMSAT had an option (exercisable within one year from the effective date of the contract) to order up to four additional satellites. COMSAT exercised its option under the contract in late 1969 ordering four additional satellites. All eight satellites sold under the Intelsat IV Contract came within one or more of the claims of the McLean Reissue Patent. Each of these satellites also utilized the Williams system for ground control of satellite attitude and velocity.

Hughes' bid for the Intelsat IV Contract and the fact of its success were the subject of extensive media coverage during 1968.

In July, 1970, Hughes' patent department concluded that the Intelsat IV satellites were not subject to royalty payments under the License Agreement because all of the

APPENDIX—Continued

Intelsat IV satellites had been sold before the McLean Patent was reissued in May, 1970. The patent department stated its conclusions on the subject of royalty payments on the Intelsat IV satellites in an internal memorandum prepared by Mr. Hammond, dated July 10, 1970. Within a few days, Robert S. Killough, Hughes' General Attorney, contacted Mr. Hammond and questioned the patent department's conclusion that the Intelsat IV satellites were not subject to royalties. Mr. Killough believed that it was possible that Hughes might end up paying royalties on these satellites for two reasons:

"(1.) the indefiniteness of the agreement on this point, and

(2.) the unusual way in which the Intelsat IV follow-up contract has been handled."

Mr. Killough wanted Hughes' accounting department and Space Systems Division to be aware of this possibility and suggested that they be so advised.

Plaintiffs argue that royalties would have been owed to them on the Intelsat IV contracts because the satellites were not sold until title passed, title did not pass until lift off, and lift off occurred after the McLean Patent reissued. Defendant argues that no royalties would have been owed because the satellites were sold at the time the contracts were executed and that occurred before the McLean Patent reissued. Under either interpretation, no royalties were due and payable at the time the paid-up license to Hughes was negotiated. For this reason (and because no payments had been received by Hughes as a result of licenses of the McLean Patent to third parties), none of the royalty reports made by Hughes to Mr. Finch and Dr. McLean prior to the execution of the Amendment were false or misleading. Furthermore, the Court finds that Hughes made a good faith determination that no royalties were due under the Intelsat IV Contract and that, in this connection, Hughes did not make any statements and did not suppress or conceal any information from Mr. Finch and Dr. McLean with the intent

APPENDIX—Continued

to deceive or mislead them or to induce them to enter into a contract.

On July 31, 1970, Hughes learned that its negotiations with Telesat Canada for the sale of communications satellites had been successful and that Hughes would be awarded a contract for three satellites. A contract between Hughes and Telesat Canada was executed on September 30, 1970. The Telesat satellites came within one or more claims of the McLean Reissue Patent.

Hughes' bid for the Telesat contract and the fact that its success was likely were publicized in July, 1970.

The Court finds that Hughes did not make any statements to Mr. Finch and Dr. McLean about the Telesat Canada negotiations or contract with the intent to mislead or deceive them or to induce them to enter into a contract. Hughes did not suppress or conceal any information from Mr. Finch and Dr. McLean about the Telesat Canada negotiations or contract with the intent to deceive or mislead them or to induce them to enter into a contract.

## IX

Mr. Finch and Dr. McLean sought a paid-up license because they preferred an immediate cash payment to the expectation of royalty payments over a number of years.

As of August, 1970, Hughes could not predict, with any certainty, the amount of income it would earn from the manufacture and sale of satellites embodying the McLean invention. At that time, Hughes had a contract with COMSAT for the manufacture of satellites and negotiations were in progress with Telesat Canada. Under these contracts, Hughes' customers had the right to terminate further satellite production at any time. Hughes had no other contracts for the manufacture of satellites and none were under negotiation. Therefore, as of August, 1970, Hughes had no assurance as to the number of satellites, if any, which Hughes would manufacture or sell in the future.

APPENDIX—Continued

Instead of a scheme to defraud Mr. Finch and Dr. McLean by obtaining a paid-up license, there was disagreement among Hughes' executives about whether obtaining such a license would be good business on Hughes' part. As of August, 1970, some of Hughes' executives involved in the satellite program believed that a trend was developing away from spin-stabilized control systems, like the systems covered by the McLean Reissue Patent, and toward other means of control such as the "three axis" system and the "body-stabilized" system. As of August, 1970, at least one of Hughes' top executives in space satellite operations believed that it would be unwise to acquire a paid-up license when future royalty obligations, and their amount, were so speculative.

One-half of one percent of the aggregate sale price of the Intelsat IV and Telesat Canada satellites is $369,932.50. This is the most that Hughes would have been obligated to pay in royalties to Mr. Finch and Dr. McLean for satellites manufactured under these contracts. In light of the circumstances existing as of August, 1970, the Court cannot conclude that a non-refundable lump sum payment of $125,-000.00 was an unreasonable, much less unconscionable, amount for Hughes to pay to Mr. Finch and Dr. McLean for a paid-up license.

Hughes' activities in the field of communications satellites received widespread publicity and Hughes' personnel reasonably assumed that Mr. Finch and Dr. McLean were aware of these activities. Mr. Finch did not ask Mr. Haskell or any other Hughes representative any questions, before or during the meeting on August 4, 1970, at which the Amendment was signed, relating to the so-called "patent pool" or whether Hughes was building any equipment which was covered by the McLean Reissue Patent. At no time during the negotiations and at no time prior to the execution of the Amendment did Hughes make any statements to Mr. Finch and Dr. McLean with the intent to deceive or mislead them or to induce them to enter into a contract. Hughes did not suppress or conceal any information from Mr. Finch and Dr.

APPENDIX—Continued

McLean with the intent to deceive or mislead them or to induce them to enter into a contract.

Hughes intended to deal fairly with Mr. Finch and Dr. McLean in arm's length negotiations, and, in fact, the negotiations leading to the execution of the Amendment were conducted fairly and at arm's length. Each side was aware that a risk was being taken: Hughes was aware that it might have agreed to pay out more and Mr. Finch and Dr. McLean were each aware that they might have agreed to accept less than Hughes would have been obligated to pay to Mr. Finch and Dr. McLean under the original agreement. Apparently, Hughes made the better deal; however, there is absolutely no credible evidence that Hughes obtained its good deal by deceiving, misleading or taking advantage of Mr. Finch and Dr. McLean or that there was, at any time, any plan, scheme or plot at Hughes Aircraft Company, or involving Hughes' officers, employees, agents or representatives, designed to deceive, mislead or take advantage of Mr. Finch and Dr. McLean.

## X

Mr. Finch and Dr. McLean met with representatives of Hughes on August 4, 1970, at Hughes' offices in Los Angeles. Mr. Finch and Dr. McLean had requested the meeting because they wanted certain language eliminated from the proposed Amendment. Mr. Finch and Dr. McLean told Mr. Haskell that they realized that the McLean invention could be used in space vehicles which were not earth satellites and that they felt that they should participate in royalties received by Hughes if it licensed a third party to use the McLean invention in such a vehicle.

At the request of Mr. Finch and Dr. McLean, the phrase "relating to the product area of earth satellites" was deleted from section 3.1 of the Amendment. This change increased the rights of Mr. Finch and Dr. McLean to share in royalty income received by Hughes from third parties and, consequently, increased Hughes' obligation to pay royalties to Mr.

APPENDIX—Continued

Finch and Dr. McLean. The change did not alter the scope of the rights which had been granted to Hughes. While the meeting was in progress, a secretary typed a new first page omitting the phrase "relating to the product area of earth satellites" from section 3.1. The new first page was then attached to the second page of the proposed amendment and the amendment was presented to Mr. Finch and Dr. McLean for signature. Before they signed the amendment, Mr. Finch and Dr. McLean reviewed the new first page and verified that the change had been made.

Hughes did not alter the amendment in any way after it was signed by Mr. Finch and Dr. McLean; specifically, Hughes did not substitute a different first page, as Plaintiffs have alleged. Hughes mailed fully executed copies of the Amendment to Mr. Finch and Dr. McLean on August 6, 1970.

## XI

At the time they entered into the License Agreement with Hughes, Mr. Finch and Dr. McLean did not expect Hughes to promote sublicensing of the original McLean Patent, and Hughes did not represent to Mr. Finch and Dr. McLean that Hughes would do so. Both Hughes and Mr. Finch and Dr. McLean understood that Hughes would seek sublicenses only after the McLean Patent had been reissued. Mr. Finch and Dr. McLean had attempted to market the McLean Patent, without success, and they were aware that its commercial value was minimal.

Mr. Finch and Dr. McLean were aware of the fact that there was little likelihood that Hughes would manufacture equipment covered by the claims of the McLean Patent; provision for payment of royalties for Hughes' own use was made so that Mr. Finch and Dr. McLean would receive compensation in the unlikely event that Hughes did manufacture equipment which came within the claims of the original McLean Patent.

APPENDIX—Continued

Hughes made reasonable efforts to sublicense the McLean Reissue Patent. Hughes offered sublicenses to all those parties likely to be interested in securing sublicenses: those parties who were manufacturing, selling or using or were likely to manufacture, sell or use equipment covered by the McLean Patent, *i.e.*, infringers and potential infringers. Hughes instituted suit, at its expense, against parties whom Hughes believed were infringing the McLean Reissue Patent and made other reasonable efforts to obtain compensation from infringers.

## XII

Under the License Agreement, Mr. Finch and Dr. McLean and Hughes did not share profits and losses. The contract provided that Mr. Finch and Dr. McLean were to receive payments equal to a percentage of the selling price of equipment manufactured, used or sold by Hughes and a percentage of gross royalties received by Hughes from licensing arrangements with third parties.

## XIII

Mr. Finch and Dr. McLean were told of the existence of the Williams application in 1967. Mr. Finch was shown a copy of the Williams Patent during a deposition in January, 1976, while being questioned about the relationship between the McLean Reissue Patent and the prosecution of the Williams continuation-in-part application. He claims to have begun an inquiry into the circumstances surrounding the execution of the License Agreement after this deposition. In July, 1976, Mr. Finch, his attorneys and an attorney representing Dr. McLean met with John A. Sarjeant, Esquire, a member of Hughes' patent and licensing department, and Messrs. Haskell and Hammond; during this meeting, the Williams patent was discussed in detail. During July, Mr. Finch also retained additional counsel, Sylvan Sack, Esquire, to conduct an investigation to determine whether Mr. Finch and Dr. McLean had any causes of action against Hughes Aircraft Company in connection with the

APPENDIX—Continued

License Agreement and Amendment. In aid of this investigation, over the next several months, Mr. Finch obtained copies of the file wrappers of several Hughes patents, records of interference proceedings involving the Williams patent, the docket entries in two infringement actions instituted by Hughes on behalf of itself and Mr. Finch and Dr. McLean, copies of depositions in those cases and in a similar action in the Court of Claims and the exhibits from the Williams file wrapper.

As of July, 1976, Mr. Finch and Dr. McLean knew

(1) that Hughes was manufacturing and selling equipment which employed the McLean invention and came within the claims of the McLean Reissue Patent and that Hughes had been doing so before the parties entered into the License Agreement, during the period between the execution of the License Agreement and the execution of the Amendment to the License Agreement and since the execution of the amendment,

(2) that the McLean Reissue Patent was of value to Hughes and that Hughes had considered the McLean Patent to be potentially valuable at the time Hughes acquired rights in the McLean Patent,

(3) of the existence and contents of the Williams application and patent, and

(4) that the McLean Patent had been cited by the Patent Office examiner in connection with the Williams application and that certain claims in the Williams application had been disallowed as a result.

As of November, 1977, Mr. Finch knew about the Intelsat IV contract and was familiar with its provisions. As of November, 1977, Mr. Finch also knew all of the other facts upon which he bases his claims for breach of contract.

Hughes did not conceal or suppress any of the facts upon which Plaintiffs base their causes of action for breach of contract and fraud.

Plaintiffs first demanded rescission of the License Agreement and Amendment at the time they commenced the

APPENDIX—Continued

instant litigation in the Circuit Court of Baltimore City in May, 1978. To date, Plaintiffs have received $135,000.00 from Hughes in consideration of the License Agreement and Amendment and $23,768.97 in royalty payments from Hughes as the result of sublicenses under the License Agreement. Plaintiffs have not returned or offered to return to Hughes any of the benefits received by Plaintiffs under the License Agreement and Amendment.

### XIV

Plaintiffs have not adduced evidence sufficient to show that Hughes does or has ever done business in the State of Maryland; therefore, the Court finds as a fact that Hughes is not doing and has never done business in the State of Maryland. Plaintiffs have not proved that Hughes does or has ever done intrastate business in Maryland, and the Court finds that Hughes has done no intrastate business in Maryland.

### XV

Beginning in May, 1967, Mr. Finch submitted bills to Hughes for legal services. His first such bill to Hughes, Defendant's Exhibit 723, was dated May 19, 1967, and totaled $4,093.50; this bill overcharged Hughes in that Hughes was billed for hours spent by Mr. Finch and expenses incurred on work done by Mr. Finch dating back to 1960, well before Mr. Finch was retained by Hughes. In this manner, Mr. Finch billed Hughes for all the work he had done in connection with the McLean Patent during some seven years before he was retained by Hughes. Also included within the eighty-two and one-half hours billed to Hughes on May 19, 1967, were costs and out of pocket expenses incurred before Mr. Finch was retained by Hughes. Mr. Finch added these amounts together, divided the total by his hourly rate and billed the converted hours to Hughes as hours spent in rendering professional services. In subsequent bills, Mr. Finch converted out of pocket charges for the services of foreign patent counsel into hours and billed

APPENDIX—Continued

these hours to Hughes at Mr. Finch's own hourly rate, falsely representing that he had rendered these services. Mr. Finch has admitted that he overcharged Hughes $23,-077.27 by submitting inflated bills.

The Court finds that Mr. Finch submitted bills to Hughes which contained statements which Mr. Finch knew to be false. Mr. Finch made these statements with the intent to deceive and mislead Hughes and to induce it to pay for time and expenses incurred by Mr. Finch not on Hughes' behalf but on behalf of himself and Dr. McLean and to pay to Mr. Finch grossly inflated amounts for professional services rendered by foreign patent counsel and billed to Mr. Finch at a much lower rate than that billed to Hughes.

Dr. McLean was not aware of Mr. Finch's fraudulent bills to Hughes.

## DISCUSSION

### I

#### *Applicable Law*

*Procedural law*

Under Maryland law, proof of fraud must be "clear and convincing and such as will appeal strongly to the conscience of the court. . . ." *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501, 517, 255 A.2d 332 (1969). *See First National Bank of Southern Maryland v. United States Fidelity & Guaranty Co.,* 275 Md. 400, 411, 340 A.2d 275 (1975) (When fraud is imputed "something more than mere preponderance of the evidence must be produced."). California law, however, requires merely that fraud be proven by a preponderance of the evidence. *Liodas v. Sahadi,* 19 Cal.3d 278 [137 Cal.Rptr. 635, 640], 562 P.2d 316, 321 (1977).

The law of Maryland determines the quantum of proof required of Plaintiffs in the cases at bar because burden of proof, a matter of procedure, is governed by the *lex fori.* Restatement (Second) of Conflict of Laws § 133 (1971); Restatement of Conflict of Laws § 595 (1934). *See*

APPENDIX—Continued

*Maryland Casualty Co. v. Williams,* 377 F.2d 389, 394 (5th Cir.1967); *Vernon v. Aubinoe,* 259 Md. 159, 162, 269 A.2d 620 (1970) (Maryland law controls the inferences to be drawn from the evidence, the sufficiency of the evidence and other procedural matters.). However, the application of California law would not change the result in the instant cases for the Court finds that Plaintiffs have failed to prove fraud by even a mere preponderance of the evidence.

*Substantive law*

*Fraud*

■ Although the parties disagree on whether California or Maryland law governs the merits of the cases at bar, the Court finds it unnecessary to resolve this issue since the application of the law of either state will produce an identical result.

*Breach of contract*

■ The License Agreement provides that "it is the intention of the parties that it shall be construed, interpreted and applied in accordance with the laws of the State of California." Since California has a substantial relationship to the parties and the transactions at issue and the application of California law will not offend any fundamental policy of the State of Maryland, there is no reason not to honor the parties' choice of law; California law will be deemed controlling on these issues. *See Kronovet v. Lipchin,* 288 Md. 30, 42, 415 A.2d 1096 (1980); Restatement (Second) of Conflict of Laws § 187 (1971).

II

*Fraud*

A

■ Under Maryland law, the elements of a cause of action for fraud are (1) that defendant made a misrepresentation of a material fact which was false; (2) that its falsity was known to him; (3) that defendant made the misrepre-

APPENDIX—Continued

sentation for the purpose of defrauding plaintiff; (4) that plaintiff not only relied upon the misrepresentation but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that plaintiff suffered damage from defendant's misrepresentation. *James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482 (1977); *Fowler v. Benton,* 229 Md. 571, 578, 185 A.2d 344 (1962), *cert. den.,* 375 U.S. 845 [84 S.Ct. 98, 11 L.Ed.2d 72] (1963). Concealment by defendant of a material fact for the purpose of defrauding plaintiff is also actionable fraud under Maryland law provided that plaintiff suffers damage as a result. *Fegeas v. Sherrill,* 218 Md. 472, 476–77, 147 A.[2d] 223 (1958). However, mere non-disclosure of facts known to defendant without intent to deceive is not fraud and is not actionable under Maryland law unless there exists a separate duty of disclosure to plaintiff by defendant. *Id.* See *Impala Platinum Limited v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 323, 389 A.2d 887 (1978); *Walsh v. Edwards,* 233 Md. 552, 567,[3] 197 A.2d 424 (1964); Restatement (Second) of the Law of Torts §§ 550 and 551 (1977); Restatement of the Law of Torts §§ 550 and 551 (1938); Restatement of the Law of Restitution § 8, comment b (1937).

 As a general rule, statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud. *Levin v. Singer,* 227 Md. 47, 63–64, 175 A.2d 423 (1961); *Appel v. [Hupfield] Hupfeld,* 198 Md. 374, 379, 84 A.2d 94 (1951). However, Maryland law recognizes a cause of action for fraud predicated upon a promise made with a present intention not to perform it. *Levin v. Singer,* 227 Md. at 63–64 [175 A.2d 423]; *Sims v. Ryland Group, Inc.,* 37 Md.App. 470, 472, 378 A.2d 1 (1977).

 In all material respects, the California law of fraud is identical to that of Maryland. Section 1572 of the California Civil Code (West 1954) provides, *inter alia*

---

**3.** 557.

APPENDIX--Continued

"Actual fraud . . . consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

"1. The suggestion, as a fact of that which is not true, by one who does not believe it to be true;

\* \* \* \* \* \*

"3. The suppression of that which is true, by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it \* \* \* \*."

Although Plaintiffs have argued strenuously that under the law of California mere non-disclosure of material facts constitutes actionable fraud, their interpretation of Section 1572 is contrary to its plain meaning. It is clear that under this section that, in order to be liable for fraud, defendant must conceal material facts from plaintiff with the intent thereby to deceive him or to induce him to enter into a contract. This interpretation is in accordance with the common law which distinguishes between concealment and suppression—the "hiding of a material fact with the object of creating or continuing false impressions as to that fact," *Fegeas v. Sherrill,* 218 Md. at 476–77 [147 A.2d 223]—and mere non-disclosure. The latter gives rise to no cause of action absent a duty of disclosure. *See* Restatement (Second) of the Law of Torts §§ 550 and 551 (1977); Restatement of the Law of Torts §§ 550 and 551 (1938); Restatement of the Law of Restitution § 8, comment b (1937). The Supreme Court of California has interpreted California law in accordance with these principles of the common law. *See Goodman v. Kennedy,* 18 Cal.3d 335 [134 Cal.Rptr. 375, 383], 556 P.2d 737, 745 (1976).

B

Plaintiffs have failed to prove fraud under the law of either California or Maryland by even a mere preponderance of the evidence. The Court has found that Hughes Aircraft Company, its officers, employees, agents or repre-

APPENDIX—Continued

sentatives, made no false statements to Mr. Finch and Dr. McLean, or either of them, nor any statement with the intent to deceive Mr. Finch and Dr. McLean, or either of them, or to induce them to enter into a contract. The Court has found that Hughes, its officers, employees, agents or representatives, made no promise to Mr. Finch and Dr. McLean, or either of them, without the intention of performing the promise. The Court has found that Hughes, its officers, employees, agents or representatives, did not conceal or suppress any facts or information with the intent to deceive Mr. Finch or Dr. McLean, or either of them, or to induce them to enter into a contract.

Plaintiffs also claim, however, that Hughes had a separate duty to disclose all material facts within its knowledge, that it failed to do so and that this failure constitutes actionable fraud. Plaintiffs argue that Hughes' duty of disclosure arose out of the existence of a confidential relationship between Dr. Puckett and Dr. McLean (and, later, Mr. Finch), the existence of a fiduciary relationship between Hughes and Dr. McLean and Mr. Finch, and because Hughes had knowledge of material facts which were not accessible to Mr. Finch and Dr. McLean. Plaintiffs also argue that even if Hughes had no duty of disclosure, once Hughes undertook to speak, it was bound not to suppress or conceal facts within its knowledge which materially qualified those stated.

### (1)

### *Confidential relationship*

Under Maryland law, a confidential relationship is created whenever confidence is reposed by one person in and accepted by another. *Lynn v. Magness,* 191 Md. 674, 684, 62 A.2d 604 (1948); *Midler v. Shapiro,* 33 Md.App. 264, 268, 364 A.2d 99 (1976). California law requires the "reposing of trust and confidence in another who is cognizant of this fact." *Vai v. Bank of America National Savings & Trust Ass'n.,* 56 Cal.2d 329 [15 Cal.Rptr. 71, 76], 364 P.2d 247, 252 (1961) (in bank). In both states, the existence *vel non* of a

APPENDIX—Continued

confidential relationship is a question of fact and is determined, therefore, on a case-by-case basis. *O'Neil v. Spillane,* 45 Cal.App.3d 147, 119 Cal.Rptr. 245, 250 (1975); *Sanders v. Sanders,* 261 Md. 268, 276, 274 A.2d 383 (1971); *Midler v. Shapiro,* 33 Md.App. at 268 [364 A.2d 99]

"Such a relationship may arise where a party is, under the circumstances, justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare. It extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence may be exercised by one person over another."

*Midler v. Shapiro,* 33 Md.App. at 268 [364 A.2d 99] (citations omitted).

 Under the circumstances, Plaintiffs' argument that a confidential relationship existed between Dr. Puckett and Dr. McLean is simply frivolous. It is abundantly clear from the evidence that the two men knew each other slightly through infrequent meetings at professional society meetings and similar gatherings and while both were members of a committee which advised the Department of Defense. While Dr. McLean undoubtedly believed Dr. Puckett to be an honorable man, there is absolutely no credible evidence in the record that Dr. McLean (or Mr. Finch, for that matter) expected Dr. Puckett to protect Dr. McLean's or Mr. Finch's interests in connection with the negotiation of the License Agreement and Amendment. There is no credible evidence that Dr. Puckett or anyone at Hughes was aware of any such reposing of trust or confidence. On the contrary, it is clear that Dr. McLean and Mr. Finch were aware that they would be negotiating with Hughes at arm's length. Mr. Finch has acknowledged this fact several times during the intervening years and he acknowledged it during the trial of the cases at bar. On one occasion, during a deposition, he characterized the relationship between Hughes, on the one hand, and Dr. McLean and Mr. Finch, on the other, as one between "opponents".

APPENDIX—Continued

The fact that all were parties to the License Agreement did not create a confidential relationship and duty of disclosure in connection with the negotiation of the Amendment. Clearly, the parties were dealing at arm's length during the negotiation of the amendment. *See Krantz v. Van Dette,* 165 F.Supp. 776, 780 (N.D.Ohio, 1958), *aff'd.* 272 F.2d 709 (6th Cir., 1959); *Blackburn v. Allen,* 218 Cal.App.2d 30, 32 Cal.Rptr. 211 (1963).

(2)

*Fiduciary relationship*

 Plaintiffs argue that a fiduciary relationship arose between Hughes, on the one hand, and Mr. Finch and Dr. McLean, on the other, because all were engaged in a joint venture. A joint venture is created when "two or more persons combine in joint business enterprise for their mutual benefit with the understanding that they are to share in profits and losses *and* each is to have voice in its management." *Brenner v. Plitt,* 182 Md. 348, 355, 34 A.2d 853 (1943). *Accord, Holtz v. United Plumbing & Heating Co.,* 49 Cal.2d 501, 319 P.2d 617, 620 (1957). Whether or not a joint venture exists depends upon the intentions of the parties which is to be determined from the facts of the case and in accordance with ordinary rules governing interpretation of contracts. *Holtz v. United Plumbing & Heating Co.,* 319 P.2d at 620; *Myers v. Gager,* 175 Cal.App.2d 314, 346 P.2d 251, 255 (1959); *Beard v. Beard,* 185 Md. 178, 185, 44 A.2d 469 (1945).

 Given the circumstances, Plaintiffs' argument that a joint venture was created by agreement of the parties is completely lacking in merit. The parties' entire agreement is embodied in the License Agreement and Amendment. Clearly, there was no community of interest or common business undertaking. Clearly, the parties did not intend or agree that Hughes, Mr. Finch and Dr. McLean would share profits and losses in any proportion. Instead, Mr. Finch and Dr. McLean were entitled to a percentage of the selling price of equipment and of the gross revenues received from

APPENDIX—Continued

licensing arrangements with third parties; they were not to share any losses. *See McCullough v. Kammerer Corp.,* 166 F.2d 759, 763 (9th Cir.1948). Since there was no joint venture, there was no fiduciary relationship between Defendant and Mr. Finch and Dr. McLean.

### (3)
### *"Superior" knowledge*

 Plaintiff argues that Hughes had a duty to disclose certain material facts because they were known only to Hughes and inaccessible to Mr. Finch and Dr. McLean **: In connection with the negotiations leading up to the License Agreement, Plaintiffs argue that Hughes had a duty to disclose to Mr. Finch and Dr. McLean the existence of the Williams application, that the patent examiner had cited the McLean Patent against certain claims in the Williams application and that Mr. Schuyler had advised Hughes that, if properly reissued, the McLean Patent could dominate precession in space. In connection with the negotiations leading up to the Amendment, Plaintiffs also argue that Hughes had a duty to disclose to Mr. Finch and Dr. McLean that certain claims put into the McLean reissue came from the Williams application, that Hughes and COMSAT had entered into the Intelsat IV contract, that one of Hughes' attorneys believed that it was possible that Hughes might have to pay royalties to Mr. Finch and Dr. McLean on equipment manufactured pursuant to this contract and that Hughes and Telesat Canada were negotiating a contract.

Assuming, without deciding, that Hughes owed some duty to reveal material facts within its own knowledge and inaccessible to Plaintiffs, its failure to disclose the matters set forth above would not have caused it to breach such a duty. Only two of these items can even arguably be deemed

---

** Certain of Plaintiffs' allegations are omitted because the Court has found that the information allegedly not disclosed was, in fact, disclosed.

APPENDIX—Continued

material facts and they were matters of public record. The remaining items were not even material facts.

The existence of the Intelsat IV contract and of negotiations with Telesat Canada are the only two items of information which can arguably be characterized as material facts. However, this information was a matter of public record and received a fair amount of publicity. In addition, there is absolutely no credible evidence in the record showing that Mr. Finch or Dr. McLean ever inquired of Hughes about its existing contracts or prospects, or that, had they done so, that Hughes would not have divulged this information. Furthermore, under the License Agreement, Mr. Finch and Dr. McLean had the right to audit Hughes' books and records in order to verify the amount of royalty due and payable to them under the Agreement. Accordingly, the existence of the Intelsat contract and of the Telesat Canada negotiations was not information solely within Hughes' knowledge or inaccessible to Mr. Finch and Dr. McLean.

The remaining items of information were not even material facts. First, Dr. McLean and Mr. Finch knew that Hughes had manufactured equipment that was covered by the disclosures in the McLean Patent—that was why Hughes wanted to obtain a license under the patent and to reissue it. The fact that Hughes had been unable to obtain patent protection itself because of the McLean Patent was immaterial since it was obvious that if Hughes had possessed patent protection on its system and had not needed the McLean Patent, that it would not have sought to acquire rights in the McLean Patent and to reissue it. It was also obvious that Hughes could not obtain its own patent on the system if Dr. McLean's patent disclosed the subject invention and was going to be reissued to claim it. The existence of the Williams application was also immaterial for the same reason; this information would have told Mr. Finch and Dr. McLean nothing more than that which they already knew.

Secondly, Mr. Schuyler's opinion as to the potential scope of reissue claims was simply that—an opinion; it was not a

APPENDIX—Continued

fact, material or otherwise. Dr. McLean and Mr. Finch were as capable as Hughes of having the McLean Patent evaluated to determine its potential scope and value.

Thirdly, Mr. Killough's opinion regarding payment of royalties under the Intelsat IV contract was also not fact but opinion. Mr. Finch and Dr. McLean had access to this contract and were free to formulate their own opinions or seek the advice of experts.

Finally, the fact that certain claims put into the McLean Reissue Patent came from the Williams application was not a material fact. Mr. Finch and Dr. McLean knew that Hughes had manufactured and planned to manufacture equipment covered by these claims. Therefore, disclosure of the source of the claims to Mr. Finch and Dr. McLean would have informed them of nothing of which they were unaware.

(4)

*"Duty of full and fair disclosure"*

Even in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud. *Rogers v. Warden,* 20 Cal.2d 286, 125 P.2d 7, 9 (1942); *Brager v. Friedenwald,* 128 Md. 8, 32, 97 A. 515 (1916); Restatement (Second) of the Law of Torts § 551(2)(b) (1977). Plaintiffs allege that Hughes breached this so-called "duty of full and fair disclosure" by comcealing[4] facts which materially qualified Dr. Puckett's statement to Dr. McLean of the circumstances under which Hughes learned of the McLean Patent. However, the Court has found that Dr. Puckett did not make the statement attributed to him by Plaintiffs. The Court has also found that Hughes did not "conceal" or "suppress" any information from Mr. Finch and Dr. McLean. Finally, the Court has carefully reviewed the entire record and finds that Hughes did not conceal, suppress or fail to disclose any facts which materially qualified

---

4. concealing.

APPENDIX—Continued

(or qualified in any way) any representations it made to Mr. Finch and Dr. McLean.

## III

### Breach of Contract

■ Plaintiffs allege in Count II of their Declaration that Hughes breached the License Agreement and Amendment by manufacturing, using and selling equipment embodying the McLean invention and licensing others to do the same but failing to pay royalties to Mr. Finch and Dr. McLean as required by these agreements. Plaintiffs have failed to prove these allegations by a preponderance of the evidence.

■ Plaintiffs also allege that the License Agreement contained an implied covenant that Hughes would exercise its best efforts to use and sublicense the McLean Patent and McLean Reissue Patent, that Hughes breached this covenant and that its active concealment of that breach was fraud. The Court has found that Hughes did indeed exercise its best efforts to sublicense the McLean Reissue Patent. The Court has also found that it was not in the contemplation of the parties at the time they made the Agreement that Hughes was obligated to actively promote the McLean Patent or to exercise its best efforts to use the McLean Patent and that there was, in fact, no market and no use for the McLean Patent. Even if such an implied covenant existed, Hughes did not breach it. Plaintiffs' allegation of fraud is also meritless since Hughes did not conceal any information from Mr. Finch and Dr. McLean.

Plaintiffs also allege that Hughes breached its duty of good faith and fair dealing toward Mr. Finch and Dr. McLean in numerous ways; however, each allegation is contrary to the facts as found by this Court.

## IV

### Limitations and Laches

Plaintiffs allege that Hughes fraudulently induced Mr. Finch and Dr. McLean to enter into two contracts, one

APPENDIX—Continued

executed in April, 1967, and the other executed in August, 1970. However, suit was not filed in equity until April 27, 1978, or at law until January 14, 1980. Plaintiffs' causes of action for fraud are time-barred in both cases as are any claims for breach of contract based on events which occurred prior to January 14, 1977.

A

*Limitations*

 An action at law based on common law fraud or breach of contract must be brought within three years from the date it accrues. Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1980); *Sasso v. Koehler,* 445 F.Supp. 762, 765 (D.Md.,1978). The Court of Appeals of Maryland has recently held that the so-called "discovery rule" is applicable generally in all civil actions. *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981). Under the discovery rule, a cause of action accrues "when the claimant in fact knew or reasonably should have known of the wrong." *Id.,* 290 Md. at 636 [431 A.2d 677]. A statutory "discovery rule" also applies in cases where "a party is kept in ignorance of a cause of action by the fraud of an adverse party[.]" Md.Cts. & Jud.Proc.Code Ann. § 5–203 (1980). Where this has occurred, "the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." *Id.*

 Under both rules, the burden is on Plaintiffs to prove that they did not discover the alleged wrong more than three years before they filed suit and that this lack of discovery was not due to Plaintiffs' unreasonable failure to exercise ordinary diligence. A plaintiff who invokes Section 5–203 of the Courts and Judicial Proceedings Article must "show affirmatively that he was kept in ignorance of his right of action by the fraud" of defendant, *Mettee v. Boone,* 251 Md. 332, 339, 247 A.2d 390 (1968), and "must specifically allege and prove when and how his knowledge of the fraud was obtained, so that the court will be enabled to determine

APPENDIX—Continued

whether he exercised reasonable diligence to ascertain the facts." *Piper v. Jenkins,* 207 Md. 308, 319, 113 A.2d 919 (1955). In cases where the "discovery rule" may be applicable, plaintiff also has the burden of proving the applicability of the rule since, ordinarily, defendant will have no personal knowledge of when plaintiff discovered, or should reasonably have discovered, the facts upon which his cause of action is based, and plaintiff will know what facts were known to him at any given period in time and what action he took to protect his rights. *See DeWitt v. United States,* 593 F.2d 276 [5] (9th Cir.,1979); *Burgon v. Kaiser Foundation Hospitals,* 93 Cal.App.3d 813, 155 Cal.Rptr. 763 (1979); *Franklin v. Albert,* 381 Mass. 611,[6] 411 N.E.2d 458 (1980).

■ Plaintiffs have failed to prove that Hughes fraudulently concealed any cause of action (or anything else) from Mr. Finch and Dr. McLean. However, even if the Court were to assume the allegations in the Declaration to be true, the Court would nevertheless find that Plaintiffs have failed to satisfy the requirements of Section 5–203 of the Courts and Judicial Proceedings Article because they have failed to specifically prove when and how knowledge of the alleged fraud was obtained. In February, 1974, Mr. Finch accused Hughes of fraudulently changing a term of the Amendment after execution by the parties in 1970. In July, 1976, Mr. Finch retained Sylvan Sack, Esquire, to investigate possible causes of action against Hughes and provided him with documentary evidence with which to begin the investigation. It is clear that Mr. Finch knew some of the facts upon which Plaintiffs' causes of action are based well before July, 1976. What is not clear is exactly what Mr. Finch and Dr. McLean knew at any given period in time. Plaintiffs have failed to meet their burden under Section 5–203 of showing that they acted within three years after they discovered, or should, in the exercise of ordinary diligence, have discovered their

---

5. 7th.

6. 381 Mass. 611.

APPENDIX—Continued

causes of action. The Court cannot find that Plaintiffs have acted diligently.

Plaintiffs have also failed to meet their burden of proof under the "discovery rule": as set forth above, they have failed to prove that they filed suit within three years from the date when they knew or reasonably should have known of the alleged wrongs.

*Laches*

■ Courts of equity view stale claims with disfavor and through application of the equitable doctrine of laches, deny relief to those who have slept upon their rights. *Cunningham v. Davidoff,* 188 Md. 437, 442, 53 A.2d 777 (1947); *Syester v. Brewer,* 27 Md. 288, 319 (1867); *Chew v. Farmers Bank of Maryland,* 9 Gill 361, 377 (1850); *Skeen v. McCarthy,* 46 Md.App. 434, 438, 418 A.2d 1214, *cert. den.,* 289 Md. 740 (1980). "The doctrine of laches is an application of the general principles of estoppel and consists of two elements—negligence or lack of diligence on the part of plaintiff in failing to assert his right, and prejudice or injury to the defendant." *Staley v. Staley,* 251 Md. 701, 703, 248 A.2d 655 [ (1968) ]. Therefore, whether plaintiff's claim is barred by laches depends on the facts and circumstances of the particular case. *Bowie v. Ford,* 269 Md. 111, 122–23, 304 A.2d 803 (1973).

■ As a general rule, mere passage of time will not constitute laches where the delay has not prejudiced defendant. *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 63, 300 A.2d 367 (1973). However, prejudice to defendant need not be shown if an analogous action at law would be barred by the applicable statute of limitations. *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. at 63 [300 A.2d 367]; *Rockshire Civic Ass'n. v. Mayor and Council of Rockville,* 32 Md.App. 22, 28, 358 A.2d 570, *cert. den.,* 289 Md. 740 [7] (1976). In such a case, the Court will apply the appropriate statute of limitations by

---

7. 278 Md. 732.

**244**

analogy. *Hall v. Barlow Corp.,* 255 Md. 28, 41–42, 255 A.2d 873 (1969); *Stevens v. Bennett,* 234 Md. 348, 199 A.2d 221 (1964).

 Plaintiffs filed their Bill of Complaint in the Circuit Court of Baltimore City on April 27, 1978. For the reasons set forth above, the Court finds that had they filed at law on that date, they would be barred by the three year statute of limitations for civil actions at law. Accordingly, their suit in equity is barred by laches. Furthermore, the Court finds that Hughes has, in fact, been prejudiced by Plaintiffs long delay, in that the memories of all concerned have dimmed considerably and certain participants in the disputed events, including Dr. McLean, have died.

## V

### *Rescission*

 Even if Plaintiffs had proven their cause in the Circuit Court of Baltimore City, they would not be entitled to the equitable remedy of rescission. A plaintiff seeking rescission must demonstrate that he acted promptly after discovery of the ground for rescission. *Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969), *cert. den.,* 396 U.S. 1037 [90 S.Ct. 681, 24 L.Ed.2d 681] (1970); *Lazorcak v. Feuerstein,* 273 Md. 69, 75–77, 327 A.2d 477 (1974). He must also show that he tendered to defendant all consideration and benefits received under the contract immediately after notice of the ground for rescission. "This effort to resume the *status quo* is required as, if a party who knows the facts which would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind." *Lazorcak v. Feuerstein,* 273 Md. at 76 [327 A.2d 477].

 Plaintiffs did not move promptly to rescind the contracts after learning of the facts upon which they base their claim for rescission. At the latest, Plaintiffs had

APPENDIX—Continued

notice of the alleged fraud in July, 1976; they did not demand rescission until April, 1978. Plaintiffs did not immediately tender back all consideration and benefits received under the contracts; indeed, they have never done so. Instead, they have continued to receive and retain benefits, thereby affirming and ratifying the contracts.

## VI

### *Counterclaims*

*Circuit Court of Baltimore City*

Mr. Finch has consented to the entry of judgment against him in favor of Hughes Aircraft Company in the amount of $23,077.27. Judgment will be entered accordingly.

*Superior Court of Baltimore City*

### A

Plaintiffs filed a Motion Raising Preliminary Objection to Hughes' Counterclaim against Mr. Finch in which they raise the defense of Hughes' lack of legal capacity to sue. They claim that Hughes lacks legal capacity to sue because "it is doing, and has done at all times since 1965, intrastate and interstate business in Maryland without complying with the requirements of Title 7, subtitle 2 of the Corporations and Associations [Article.]" Plaintiffs have the burden of proving that Hughes is "doing business in the State." *S.A.S. Personnel Consultants, Inc. v. Pat-Pan, Inc.,* 286 Md. 335, 339, 407 A.2d 1139 (1979). They have failed to meet this burden.

" '[A] foreign corporation is doing business within a state when it transacts some substantial part of its ordinary business therein.' " *Id.,* 286 Md. at 339 [407 A.2d 1139], *quoting Chesapeake Supply & Equip. Co. v. Manitowoc Engineering Corp.,* 232 Md. 555, 562, 194 A.2d 624 (1963).[8] Plaintiffs have failed to prove that Hughes is doing or had done any type of business in Maryland. More importantly,

---

**8.** (1963).

APPENDIX—Continued

they have failed to prove that Hughes' alleged business in Maryland is intrastate in character such that application of Maryland's "closed door" statute to bar Hughes' Counterclaim would not offend the Commerce Clause of the Constitution of the United States. *See Allenberg Cotton Co. v. Pittman,* 419 U.S. 20 [95 S.Ct. 260, 42 L.Ed.2d 195] (1974); *Eli Lilly Co. v. Sav-On-Drugs, Inc.,* 366 U.S. 276 [81 S.Ct. 1316, 6 L.Ed.2d 288] (1961); *York Manufacturing Co. v. Colley,* 247 U.S. 21 [38 S.Ct. 430, 62 L.Ed. 963] (1918); *Baker & Co. v. Preferred Risk Mutual Insurance Co.,* 569 F.2d 1347 (5th Cir.,1978); *Cement Asbestos Products v. Hartford Accident & Indemnity Co.,* 592 F.2d 1144 (10th Cir.,1979); *Uncle Ben's, Inc. v. Crowell,* 482 F.Supp. 1149 (E.D.Ark.,1980).

■ Even if Plaintiffs had proven that Hughes was doing intrastate business in Maryland, Section 7–301 would not bar Hughes from maintaining their Counterclaim in the case at bar. By the weight of authority "the statutory bar to an unregistered corporation's maintaining a suit does not preclude it from asserting a counterclaim arising out of the subject matter of the plaintiffs' suit." *Aberle Hosiery Co. v. American Arbitration Association,* 337 F.Supp. 90, 92 (E.D.Pa. [1972] ),[9] *appeal dismissed,* 461 F.2d 1005 (3rd Cir.,1972). *See also Intra-Mar Shipping v. John S. Emery & Co.,* 11 F.R.D. 284, 288 (S.D.N.Y., 1951); *Kupka v. Morey,* 541 P.2d 740, 752 (Alaska, 1975); *Burley Newspapers, Inc. v. Mist Publishing Co.,* 90 Idaho [515] 526,[10] 414 P.2d 460, 462 (1966); *McLaughlin v. Rainville Co., Inc.,* 22 Ill.App.3d 128, 316 N.E.2d 819, 820 (1974); *State v. Cook United, Inc.,* 463 S.W.2d 509, 515–16 (Tex.Civ.App.,1971).

For the foregoing reasons, the Motion Raising Preliminary Objection will be overruled.

B

■ Hughes has proved by clear and convincing evidence that Mr. Finch submitted bills for professional services to

---

9. (1972).

10. 515.

APPENDIX—Continued

Hughes which overstated the amounts due to Mr. Finch for professional services, that Mr. Finch knew that the bills were false, that Mr. Finch's purpose was to defraud Hughes, that Hughes acted in reliance upon the misrepresentations and had the right to do so. Mr. Finch has admitted that he over-charged Hughes by $23,077.27. Therefore, Hughes has proved each element of its cause of action for fraud. *See James v. Weisheit,* 279 Md. at 44 [367 A.2d 482]; *Fowler v. Benton,* 229 Md. at 578 [185 A.2d 344]. The fraud was concealed from Hughes by Mr. Finch and was of such a nature as to conceal itself; therefore, the statute of limitations was tolled. Md.Cts. & Jud.Proc.Code Ann. § 5-203 (1980); *Brack v. Evans,* 230 Md. 548, 555, 187 A.2d 880 (1963); *Piper v. Jenkins,* 207 Md. at 315 [113 A.2d 919].

C

Defendant has claimed both compensatory and punitive damages. As alternative relief to the $23,077.27 in damages awarded to Hughes Aircraft Company on its Counterclaim in the Circuit Court case, the Court will enter judgment for Hughes on its Counterclaim in the Superior Court case in the amount of $23,077.27.

Punitive damages may be awarded in an action for deceit "where the wrong involved some violation of duty springing from a relationship of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness." *Loyola Federal Savings & Loan Association v. Trenchcraft,* 17 Md.App. 646, 663, 303 A.2d 432 (1973), *quoting Fowler v. Benton,* 245 Md. at 552 [185 A.2d 344]. The Court believes that an award of punitive damages against Mr. Finch is appropriate in this case. Mr. Finch, an attorney, violated his fiduciary duty to Hughes, his client, by submitting to Hughes false and fraudulent bills for professional services. His fraud was gross: it resulted in payment for services not rendered; it resulted in payment for costs incurred by Mr. Finch and Dr. McLean before Mr. Finch was

**248**

retained by Hughes; it resulted in grossly inflated bills for services rendered by foreign counsel, billed to Mr. Finch at a relatively low rate and then billed to Hughes at a much higher rate. The Court believes that an award of $10,000.00 in punitive damages is justified and will, as additional relief to Hughes, enter judgment accordingly.

DATED: August 31, 1982

/s/Joseph H.H. Kaplan
Joseph H.H. Kaplan
Judge